| |  |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>Bradford J. Sandler, Esq.<br>Paul J. Labov, Esq.<br>Colin R. Robinson, Esq.<br>PACHULSKI STANG ZIEHL & JONES LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017<br>Telephone: (212) 561-7700<br>Facsimile: (212) 561-7777<br>bsandler@pszjlaw.com<br>plabov@pszjlaw.com<br>crobinson@pszjlaw.com<br><br>Peter O. Larsen, Esq. (admitted *pro hac vice*)<br>Raye Elliott, Esq. (admitted *pro hac vice*)<br>50 North Laura Street, Suite 3100<br>Jacksonville, FL 32202<br>Telephone: (904) 798-3700<br>Facsimile: (904) 798-3730<br>peter.larsen@akerman.com<br>raye.elliott@akerman.com<br><br>*Counsel to the Plan Administrator* | |
| In re:<br><br>20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc., *et.al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 23-13359(VFP)<br><br>(Jointly Administered) |
| MICHAEL GOLDBERG, as Plan Administrator for 20230930-DK-BUTTERFLY-1, INC. f/k/a Bed Bath & Beyond, Inc.,<br><br>        Plaintiff,<br><br>v.<br><br>NEW JERSEY ECONOMIC DEVELOPMENT AUTHORITY,<br><br>        Defendant. | Adversary Proceeding No. 24-01443-VFP |

### RESPONSE TO DEFENDANT'S SUPPLEMENTAL
### MEMORANDUM OF LAW REGARDING THE AUGUST 7, 2023 LETTERS

Michael Goldberg, in his capacity as Plan Administrator (the "Plan Administrator" or "Plaintiff") for 20230930-DK-Butterfly-1, Inc. f/k/a Bed Bath and Beyond, Inc.[1] and affiliated debtors (the "Debtors"), by and through undersigned counsel, submits this Response to Defendant's Supplemental Memorandum of Law Regarding the August 7, 2023 Letters (Adv. Doc. 42) filed by the New Jersey Economic Development Authority (the "NJEDA").

### Preliminary Statement

As detailed in the Plan Administrators' Motion for Leave to File Amended Complaint and attached proposed amended complaint (Adv. Doc. 41), the BEIP Debtors (defined *infra*) were induced by the NJEDA to create thousands of jobs in New Jersey in exchange for tax credits. The BEIP Debtors fulfilled their promise for 11 years, provided the promised jobs, and the NJEDA refused to pay the promised tax credits, including tax credits that had been certified and approved by the New Jersey Division of Taxation (the "Division") as being due and payable. The NJEDA offered excuse after excuse for its failure to pay over the tax credits, such as the requirement of a modification to an agreement simply because of a name change for one of the BEIP Debtors which then took six years for NJEDA to approve. Had NJEDA actually paid the tax credits when they were due, there would be no question that the BEIP Debtors would have been entitled to retain all or most of the tax credits. For reasons completely unrelated to the agreements at issue in this case (the "Grant Agreements" or "Agreements"), the BEIP Debtors' business disruptions caused them to have to file for bankruptcy, and as a result the BEIP Debtors could no longer provide the

---

[1] Pursuant to the Certificate of Amendment of the Certificate of Incorporation of Bed Bath & Beyond, Inc. which was filed with the State of New York Department of State on September 21, 2023, the name of the entity formerly known as "Bed Bath & Beyond, Inc." was changed to 20230930-DK-Butterfly, Inc.

requisite number of jobs to qualify for the tax credits, but only starting in 2021. The NJEDA now argues before this Court that the NJEDA's breaches of the Grant Agreements are excused because NJEDA refused to pay for a long enough period of time that the BEIP Debtors' bankruptcy filing now allows it avoid paying amounts that were clearly owed.  New Jersey contract law is clear that a party (the NJEDA) cannot show or claim that the BEIP Debtors breached a contract unless the NJEDA has first shown that it has performed its obligations under the contract or was excused from performing. *See City of Trenton v. Cannon Cochran Mgmt. Servs., Inc.*, No. A-5576-09T1, 2011 WL 3241579, at *4 (N.J. Super. Ct. App. Div. Aug. 1, 2011) (explaining that, "A party in breach of contract cannot rely on the other party's subsequent failure to perform to excuse its own prior breach."). The NJEDA cannot show that it performed its obligations under the Grant Agreements because it failed to pay material sums under the Agreements, and although it may be excused from performance for periods that the job requirements were not met as a result of the bankruptcy filing, the NJEDA's material breaches of the Agreements cannot, under New Jersey law, form the basis for claiming the BEIP Debtors were in breach. Moreover, the Grant Agreements only excuse NJEDA from paying amounts not yet paid, which can only reasonably be read as applying to payments that had not yet been due to have been paid (as opposed to allowing the NJEDA to be in default for 10 years and then to reap a windfall at the expense of the BEIP Debtors based on a claim that the NJEDA is entitled to keep the funds earned by the BEIP Debtors solely because the NJEDA had managed to escape paying the past due amounts for all of these years).

**Argument**

I.      **The August 7 Letters Do Not Constitute Notice of Default**

The Court's Order[2] asked the NJEDA to set forth its position regarding why the August 7, 2023 termination letters (the "Termination Letters") it issued (which are attached as Exhibit D to Plaintiff's Complaint) were effective "to withhold payment of all Grant payments not yet paid at the time of the default during such time as an Event or Events of Default remain uncured" as set forth in Section 15 of the parties' Grant Agreements.

As indicated above, the Termination Letters could not have been effective because, at the time of the letters, the NJEDA was in material breach of the Grant Agreements, had wholly failed to perform under the Agreements and therefore, under New Jersey law, cannot claim that the BEIP Debtors are in material breach for payments relating to those prior years. *See Marino v. Brighton Gardens of Mountainside*, 697 F. Supp. 3d 224, 233 (D.N.J. 2023) (explaining that a party in breach of contract not being able to rely on the other party's subsequent failure to perform to excuse its own prior breach is "a widely-followed principle of contemporary contract law in New Jersey"). Thus, regardless of the content of the Termination Letters, the NJEDA cannot claim benefits or damages from an alleged breach when the NJEDA was already in perpetual and material breach.

---

[2] Although not within the scope of the Court's Order dated February 4, 2025, the BEIP Debtors note that, as argued in Plaintiff's Motion for Leave to File Amended Complaint, despite being referenced in the Grant Agreements, the New Jersey Contractual Liability Act at N.J.S.A. § 59:13-1, *et. seq.*, does not apply in this case because the NJEDA is an agency that can sue and be sued, and the fact that the Grant Agreements state that the Act applies means that all provisions of the Act apply, including the provision that states that the Act does not apply to agencies such as the NJEDA that can sue and be sued.

There is no dispute that the NJEDA failed to provide the contractually required notice before attempting to terminate the Grant Agreements. Meanwhile, the course of conduct of the NJEDA during the entire length of the Grant Agreements was to delay, promise some amount of payment, cite various excuses, and generally to lead the BEIP Debtors into inaction. This type of fact scenario is one of the reasons notice and opportunity to cure provisions are contained in contracts.

In order to cure the NJEDA's additional non-performance under the Grant Agreements, the NJEDA argues in its Supplemental Memorandum that the August 7, 2023 Termination Letters served as notice of the BEIP Debtors' default under the Agreements and that, somehow, the Grant Agreements then automatically terminated 30 days later. These Termination Letters advise the BEIP Debtors of their default <u>for years 2021 and 2022</u> only for failure to meet "program employment requirements". The Termination Letters then state that the Grant Agreements are terminated "effective immediately" – despite the requirements of the Agreements that 30 days' notice of an "Event of Default" is required to terminate the respective Agreements.[3] No such letter was ever sent, nor has any such letter ever been sent, with respect to the December 4, 2006 Grant Agreement entered into by Christmas Tree Shops, Inc., (the "CTS Agreement") (which was formerly a wholly owned subsidiary of BBB) and NJEDA.

The language in paragraph 14 of the Grant Agreements is clear and unambiguous: "Any one or more of the following shall constitute an event of default ("Event of Default") if the default

---

[3] The other agreements besides the CTS Agreement are the December 4, 2006 Grant Agreement between the Debtor formerly known as Bed Bath & Beyond, Inc. ("BBB") and NJEDA (the "Woodbridge Agreement") and the July 25, 2011 Grant Agreement between BBB, and the Debtors formerly known as Bed Bath & Beyond of California LLC (now known as 20230930Butterfly-36, LLC), Liberty Procurement Company (formerly known as Bed Bath & Beyond Procurement Co.), BBB Value Services, Inc., (now known as 20230930-DK-Butterfly-1, Inc.), Buy Buy Baby Stores, Inc., Harmon Stores, Inc., and Christmas Tree Shops, Inc. (collectively and together with BBB, the "BEIP Debtors") and NJEDA (the "Headquarters Agreement").

is not cured within thirty (30) days ***after written notice of the default*** . . . ." The plain language of the Grant Agreements clearly state that failure to maintain the required number of jobs is a default only if the default is not cured within 30 days after written notice of the default. Likewise, paragraph 15 of the Grant Agreements provide remedies upon an "Event of Default" only "***after having first given Grantee notice and opportunity to cure the default in accordance with Paragraph 14 hereof***." Because NJEDA did not send written notice to the BEIP Debtors prior to terminating the Grant Agreements, it now argues that the letters themselves are the "notice" of default required under the contracts and that the Grant Agreements terminated automatically 30 days later.

However, the NJEDA cannot claim that the BEIP Debtors were in default for any years prior to 2021 and 2022 because the NJEDA was already in material default itself for non-payment of amounts due and because it had wholly failed to perform its obligations under the Grant Agreements. Moreover, even if the NJEDA could have terminated the Grant Agreements for those years, a contract does not terminate "automatically" upon a party's breach of the agreement. "While termination does not occur automatically at the breach, termination does occur once the non-breaching party exercises its right of termination. This can be done by 'notifying the breaching party of its intent to terminate and stopping its own performance under the contract.'" *In re Pazzo Pazzo, Inc.*, 593 B.R. 419, 424 (Bankr. D.N.J. 2018) *quoting Nickels Midway Pier, LLC v. Wild Waves, LLC*, 372 B.R. 218, 223 (D.N.J. 2007). *See also In re Nickels Midway Pier, LLC*, 372 B.R. 218, 223 (D.N.J. 2007) (explaining that, "Unlike a breach, which automatically occurs upon a party's failure to perform, termination does not automatically occur upon a party's material breach."). If the August 7, 2023 letters served as the "notice" of the default required under

Case 24-01443-VFP    Doc 46    Filed 04/07/25    Entered 04/07/25 17:01:00    Desc Main
Document    Page 7 of 15

paragraphs 14 and 15 of the Grant Agreements, there was no subsequent actual termination of the agreements.

NJEDA also argues that, even if the Grant Agreements were not technically terminated, it still had and has the right to withhold all tax credits not paid as of the date of the BEIP Debtors' default under Section 15.A.(3) of the Grant Agreements which provides that one of the remedies available upon default is to "withhold payment of all Grant payments not yet paid at the time of the default during such time as an Event or Events of Default remain uncured." *See* Complaint at Ex. D. But this goes to the heart of the Plaintiff's proposed amended complaint which is the subject of Plaintiff's Motion for Leave to File Amended Complaint – if NJEDA had *timely* paid the BEIP Debtors the grants and tax credits which they were owed, the tax credits would have been paid by the time of the BEIP Debtors' alleged default in 2021 and 2022. And even if the BEIP Debtors subsequently defaulted under the Grant Agreements, they would be entitled to retain all or most of the grant payments or credits paid because Section 15.A.(1) of the Grant Agreements provides for repayment of only a portion of the grant payments upon the business's default, based on the length of the time the business was in compliance with the agreement.

By 2021 when the NJEDA claims that the BEIP Debtors first defaulted under the Grant Agreements, the NJEDA was already in material default because it was required to have already paid the BEIP Debtors the following tax credits under the provisions of N.J.S.A. § 34:1B-129, which provides the payment schedule for payment of the economic incentive grants:

- In 2017, the BEIP Debtors should have received 5% of the amounts owed for 2011-2013;

- In 2018, the BEIP Debtors should have received 20% of the amounts owed for 2011-2013.

- In 2019, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; and (3) 25% of the amounts owed for 2015.

- In 2020, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; (3) 25% of the amounts owed for 2015; (4) 33% of the amounts owed for 2016; and (5) 33% of the amounts owed for 2017.

- In 2021, the BEIP Debtors should have received (1) 25% of the amounts owed for 2011-2013; (2) 25% of the amounts owed for 2014; (3) 25% of the amounts owed for 2015; (4) 33% of the amounts owed for 2016; and (5) 33% of the amounts owed for 2017.

- In 2022, the BEIP Debtors should have received: (1) 25% of the amounts owed for 2014; (2) 25% of the amounts owed for 2015; (3) 33% of the amounts owed for 2016; (4) 33% of the amounts owed for 2017; (5) 50% of the amount owed for 2018; and (6) 50% of the amount owed for 2019.

- In 2023, the BEIP Debtors should have received: (1) 50% of the amount owed for 2018; (4) 50% of the amount owed for 2019; and (5) 50% of the amount owed for 2020.

Had NJEDA actually performed its obligations under the Grant Agreements instead of perpetually being in material default, by the time of any alleged default in 2021 the BEIP Debtors would have received 75% of the tax credits they were owed for 2011 through 2013, 50% of the tax credits they were owed for 2014 through 2015, and 33% of the tax credits they were owed for 2016 through 2017. Had NJEDA actually complied with the requirements of the statute, by the time NJEDA purportedly gave notice of the default the BEIP Debtors would have received 100% of the tax credits they were owed for 2011 through 2019 and 50% of the tax credits owed for 2020. Had the NJEDA complied with its clear legal obligations under the terms of the Grant Agreements and N.J.S.A. § 34:1B-129, a significant portion of the tax credits would have been issued to the BEIP Debtors prior to termination of the Grant Agreements by the NJEDA.

Further, under Section 15.A.(1) the Grant Agreements, the BEIP Debtors were in compliance with the Woodbridge Agreement for at least 80% of the commitment period, were in compliance with the Headquarters Agreement for at least 66% of the commitment period, and were in compliance with the CTS Agreement for at least 73% of the commitment period. Accordingly,

the BEIP Debtors would have been entitled to retain a minimum of 80%, 66%, and 73% of the tax credits paid under the respective agreements.

As detailed in the Plaintiff's proposed amended complaint, NJEDA acknowledged in writing that the tax credits had been certified or approved by the Division and there is no question that the BEIP Debtors were entitled to the credits. For the Woodbridge Agreement, in 2016, the NJEDA notified the BEIP Debtors that the tax credits for 2011 through 2013 had been certified by the Division; in 2017, NJEDA notified that the tax credits for 2014 through 2015 had been reviewed and finalized by the Division; in 2020, NJEDA notified that the Division had certified the tax credits for 2011 through 2015. For the Headquarters Agreement, in 2017 NJEDA notified the BEIP Debtors that the Division had reviewed and finalized the tax credits for 2011 through 2012; in 2018, the NJEDA notified that over $2.8 million of tax credits had been certified for 2013; in 2019, the NJEDA notified that the Division had finalized the tax credits for 2015, and in 2020, the NJEDA notified that the Division had finalized the tax credits for 2016. ***Yet none of these tax credits were ever actually paid by NJEDA.***

Regardless of whether NJEDA complied with the terms of the Grant Agreements by providing notice of default and regardless of whether the NJEDA properly terminated the Agreements, the NJEDA is prohibited by the agreements and by New Jersey contract law from reaping a windfall from its own material breach and from enforcing provisions of the Grant Agreements without first showing that the NJEDA performed under the agreements. *See City of Trenton*, 2011 WL 3241579; *Marino*, 697 F. Supp. 3d 224.

## II. NJEDA Was Required to Provide Notice Before Terminating the Grant Agreements

As explained at length in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings (Adv. Doc. 30), the clear and express terms of the Grant

Agreements require the NJEDA to provide 30 days' notice of default prior to terminating the Grant Agreements. In this case, NJEDA did not provide the required notice of default to the BEIP Debtors prior to attempting to terminate the Grant Agreements. NJEDA now argues that it was not required to provide the contractually mandated notice because it would have been "futile," since the BEIP Debtors could not have cured in 2023 the failure to maintain the required number of jobs in 2021 and 2022. NJEDA cites to only two trial court cases in New Jersey for that proposition, neither of which are binding authority or even persuasive.

But before turning to those two cases and the NJEDA's "futility" argument, it is important to note that, in the absence of binding appellate precedent on a contractual issue, courts must follow state law principles of contract interpretation, including the overriding principle that the parties intended for clear and unambiguous contract terms to be respected and to be given their plain and ordinary meaning. *See In re Catanzareti*, 400 B.R. 145, 157 (Bankr. D.N.J. 2009), *aff'd*, No. CIV.A.09-2666GEB, 2009 WL 3424176 (D.N.J. Oct. 20, 2009). Construction of a contract is not permitted when the language of the contract is plain and unambiguous. *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 838 F. Supp. 184, 190 (D.N.J. 1993). Contract terms are generally given their "plain and ordinary meaning." *Matter of Est. of Jones*, 477 N.J. Super. 203, 217, 305 A.3d 525, 533 (App. Div. 2023). If a court finds the terms of a contract are clear and unambiguous, there is no room for construction and the court <u>must</u> enforce those terms as written. *C.L. v. Div. of Med. Assistance & Health Servs.*, 473 N.J. Super. 591, 284 A.3d 860 (App. Div. 2022). In this case, the language of the Grant Agreements is clear and unambiguous and must be enforced as written. Under paragraph 14 of the Grant Agreements, an "Event of Default" under the Grant Agreements occurs if, and only if, written notice is first provided to the grant recipient and the default is not cured within 30 days. Under paragraph 15 of the Grant Agreements, the Grant Agreements may

only be terminated and unpaid grants forfeited if, and only if, notice was first given to the grant recipient under paragraph 14. The terms must be enforced by this Court as written. Because no notice of default for failure to maintain the minimum number of jobs was given by the NJEDA for 2021 and 2022, an "Event of Default" does not exist under the Grant Agreements for those years. Therefore, NJEDA has still not terminated the Grant Agreements and, even if it had, such a termination does not provide a basis to withhold payments under the Grant Agreements that had been due for multiple years.

The parties expressly bargained for the notice provision in the Grant Agreements knowing that the failure to provide a certain level of jobs in a particular year could cause the potential termination of the Grant Agreement at issue. Nevertheless, the parties agreed that in that exact scenario that the NJEDA would be required to provide notice to the BEIP Debtors. There are multiple reasons why parties may include notice provisions in contracts that can extend to reasons well beyond the right to cure the default, and it is clear in this case that the parties expressly agreed on this requirement. It is not necessary under the law to provide these reasons, but parties include notice provisions in contracts for multiple reasons that are in addition to obtaining the right to cure a default which further gives these notice provisions meaning. For example, parties often include notice provisions to ensure clear communication between the parties as to how the parties view the occurrence of certain events, which can reduce or avoid disputes, a notice provision ensures that an allegedly defaulting party is formally notified of the alleged breach and the specific nature of the default, notice provisions provide parties the opportunity to discuss disputes, engage in alternative dispute resolution or to clear up factual misunderstanding or ambiguous or unclear situations, notice provisions document a party's position on an issue and establish a timeline for when action must be taken, and notice provisions also, by providing details on the nature of the

alleged default, provide the defaulting party the ability to mitigate damages. There are multiple other reasons, which is why courts follow the clear and unambiguous language that the parties placed into their contracts. As a result, this Court does not have the authority under New Jersey contract law to write this provision out of the Grant Agreements.

The two cases cited by the NJEDA are not binding precedent nor do they apply in this case. The first case is a 53-year-old case from the New Jersey trial court, *Young Travelers Day Camps, Inc. v. Felsen*, 118 N.J. Super. 304 (Dist. Ct. 1972) which follows a <u>minority view</u> on the subject of required notice that has not been adopted by a New Jersey appellate court. In that case, the defendant, Felsen, entered into a franchise agreement with plaintiff to operate children's summer day camps. Felsen breached the contract by failing to procure sufficient contracts for children to attend the camp and failing to provide the copies of the contracts he did procure to the plaintiff. Plaintiff terminated the franchise agreement without providing a five day notice prior to termination as required by the franchise agreement and defendant argued that the contract had been improperly terminated. The trial judge stated that there was no New Jersey case on point and that the **<u>majority</u>** view outside of New Jersey was that if a notice provision is included in a contract, it constitutes the exclusive means by which the contract can be terminated. *See Young Travelers*, 118 N.J. Super. at 310. Rather than follow the majority view, the trial judge in this case ruled only that a notice provision in a contract is not the exclusive method by which a contract may be terminated when there has been a material breach by the party which could not be rectified. *See id.*, 118 N.J. Super. at 314-15. Importantly, the trial judge did not rule that in all cases the parties' express agreement could be disregarded solely when a judge believes that the default cannot be cured.

One other New Jersey case (also cited by NJEDA) later cited *Young Travelers* as authority for this proposition and that also was only a federal trial court in *Twin Crest Grp. v. Delaware*

*Valley Urology, LLC*, No. CIV. 10-6350 JS, 2013 WL 6508242 (D.N.J. Dec. 12, 2013). *Twin Crest* dealt with a dispute under the parties' contract for Twin Crest to construct and run a pathology lab in the office of Delaware Valley's physician practice group. Delaware Valley terminated the contract when Twin Crest failed to obtain the required license for the pathology lab resulting in Medicare refusing to pay for the lab services. The issue in this case was whether Delaware Valley was permitted to terminate the contract without first providing notice to Twin Crest of its default, since the contract required ten days' notice to terminate. A year after the contract was terminated, Twin Crest sued Delaware Valley for breach of contract along with other claims. Delaware Valley filed counterclaims against Twin Crest for breach of contract and other claims. Twin Crest argued that the contract required Delaware Valley to provide it with ten days' notice of any breach and an opportunity to cure the breach before Delaware Valley could sue for damages under the contract. The real issue before the court in that case was whether the ten days' notice language in the contract applied both to termination of the contract and the ability to sue for damages under the contract. The court interpreted the contract as providing that Delaware Valley retained its common law right to sue for damages based on a material breach of the contract, even if it did not first provide notice and an opportunity to cure to Twin Valley. 2013 WL 6508242 at * 7. In dicta, the court discussed the fact that notice and an opportunity to cure would have been futile because Twin Valley could not go back in time to procure the license required for Medicare reimbursement of the lab services, but this was not the issue in the case and was only dicta. Neither of these cases are binding authority on this Court, nor are they even persuasive authority, and neither of the holdings would even apply or make sense in this case.

Again, the heart of this case is that the BEIP Debtors are entitled to pursue their claims against the NJEDA for its failure to pay over tax credits earned by the BEIP Debtors and that were

specifically acknowledged in writing by the NJEDA to be due and owing. The BEIP Debtors are entitled to payment on these claims regardless of whether the NJEDA has the authority to terminate the Grant Agreements and regardless of whether the NJEDA actually terminated the Grant Agreements. In order to declare and enforce a default under a contract, the party seeking to declare a default must first show that it has performed its duties under the contract. Not only had the NJEDA wholly failed to perform any of its obligations under the Grant Agreements for years, the NJEDA also failed to give proper notice of default to the BEIP Debtors. Nevertheless, even if the NJEDA had given proper notice, the NJEDA would still be required to pay to the BEIP Debtors the amounts earned under the Grant Agreements for the years prior to any default. To hold otherwise would allow a government agency to wholly fail to perform under and breach a contract for years by withholding payment that it acknowledged was due and owing and then, years later, withhold payment of amounts that had been due, owing and earned on the grounds that the other party breached the contract, <u>after</u> those amounts had been earned and were not subject to forfeiture. The Court should not permit the NJEDA to do that. State agencies "'must 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens.' The government must act fairly and 'adhere to strict standards in its contractual dealings' while also acting consistently with its 'supervening obligation . . . to deal scrupulously with the public.'" *Holtec Int'l v. New Jersey Econ. Dev. Auth.*, No. A-1477-21, 2023 WL 8264184, at *5 (N.J. Super. Ct. App. Div. Nov. 30, 2023) (quoting *W.V. Pangborne & Co., Inc. v. N.J. Dep't of Transp.*, 116 N.J. 543, 561-562 (1989)). This Court must ensure that NJEDA acts fairly and deals scrupulously with the public by requiring it to pay the tax credits it has acknowledge were due and owing to the BEIP Debtors.

| | |
|---|---|
| Dated: April 7, 2025 | PACHULSKI STANG ZIEHL & JONES LLP |
| | |
| | */s/ Colin R. Robinson* |
| | Bradford J. Sandler |
| | Paul J. Labov |
| | Colin R. Robinson |
| | 780 Third Avenue, 34th Floor |
| | New York, NY 10017 |
| | Telephone: (212) 561-7700 |
| | Facsimile: (212) 561-7777 |
| | bsandler@pszjlaw.com |
| | plabov@pszjlaw.com |
| | crobinson@pszjlaw.com |
| | |
| | and |
| | |
| | Peter O. Larsen (*admitted* pro hac vice) |
| | Raye Elliott (*admitted* pro hac vice) |
| | 50 North Laura Street, Suite 3100 |
| | Jacksonville, FL 32202 |
| | Telephone: (904) 798-3700 |
| | Facsimile: (904) 798-3730 |
| | peter.larsen@akerman.com |
| | raye.elliott@akerman.com |
| | |
| | *Counsel to the Plan Administrator* |